# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THALDARIS TALLEY,                                )
                                                 )
      Plaintiff,                         )
                                                 )
      v.                                 )    **Civil Case No. 14-1313 (RJL)**
                                                 )
KIRSTJEN NEILSEN,                                )
**Secretary of Homeland Security,**              )
**U.S. Dep't of Homeland Security,**             )
                                                 )
      Defendant.                         )

**FILED**

FEB 1 3 2019

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## MEMORANDUM OPINION
(February *12*, 2019) [Dkt. # 24]

Thaldaris Talley ("Talley" or "plaintiff") brought this action against his former employer, the Immigration and Customs Enforcement ("ICE") agency within the Department of Homeland Security ("DHS" or "defendant"), alleging unlawful discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2 *et seq*. At all relevant times, plaintiff was employed by ICE as a Detention Deportation Officer. Plaintiff applied, but was not selected, for three different "Supervisory Detention Deportation Officer (Unit Chief)" positions. He contends that his non-selection for these positions was the product of racial discrimination and retaliation for prior protected Equal Employment Opportunity ("EEO") activity. Pending before me is defendant's motion for summary judgment. Based on the parties' briefing and the entire record herein, and for the reasons set forth below, defendant's motion for summary judgment is **GRANTED**.

1

## BACKGROUND

Plaintiff, an African-American male, served as a Detention Deportation Officer at the Washington, D.C. headquarters of ICE Enforcement and Removal Operations ("ERO") from 2006 through his retirement during the pendency of this case. *See* Def. Ex. 1 ("EEO Report of Investigation") at 6 [Dkt. # 24-1]; Pl. Ex. 10 ("Pl.'s Stmt. of Facts") at 1–2 [Dkt. # 25-10]; *id.* at 9. His experience as a Detention Deportation Officer dates to 1996 and includes extensive work in a supervisory and leadership capacity. *See* EEO Report of Investigation at 6. Talley also had an impressive career in the Air Force, commanding a large police unit and ultimately attaining the rank of Lieutenant Colonel. All told, Talley has over 21 years of supervisory law enforcement experience, over 11 years of active duty and 10 years of reserve duty service in a supervisory capacity, and at various times served as acting supervisor for his unit in ICE. *See id.*; Def. Ex. 2 (Aff. of Thaldaris M. Talley ("Talley Aff.")) at 4–5; Def. Ex. 13 (Supp. Aff. of Thaldaris M. Talley ("Supp. Talley Aff.")) at 4–5; Def. Ex. 21 ("Talley Resume"); Pl.'s Stmt. of Facts at 3.

In 2010, Talley responded to two separate job announcements for the position of Supervisory Detention Deportation Officer (Unit Chief). *See* EEO Report of Investigation at 1–2, 5–6; Talley Aff. at 1, 3; Supp. Talley Aff. at 1, 3; Def. Ex. 19 ("Vacancy Announcement No. 384724"); Def. Ex. 12 ("EEO Supp. Report of Investigation") at 1–2. According to the record, while Talley applied to two job postings, he was in fact considered for three distinct Unit Chief positions. *Id.*; EEO Report of Investigation at 1–2.

As to the first announcement (vacancy number 321130), Talley received an automated email on April 9, 2010, informing him that he had been deemed "qualified for

2

the position" and that his name had been "referred . . . to the selecting official(s) for consideration." Def. Ex. 3 at 2 ("Email Dated April 9, 2010"). On May 5, 2010, Talley received a second automated email notifying him that he was not selected for the 321130 Unit Chief vacancy. Def. Ex. 3 at 3–4 ("Email Dated May 5, 2010"). In fact, Talley's application for the 321130 posting received consideration for Unit Chief of both the Data Quality and Integrity ("DQI") Unit and the Information, Policy, and Communications ("IPC") Unit. *See* EEO Report of Investigation at 7–8, 11; Def. Ex. 4 (Aff. of Matthew J. Bronick ("Bronick Aff.")) at 4–5; Def. Ex. 5 (Aff. of Patrick Contreras ("Contreras Aff.")) at 4–5; Def. Ex. 8 (Affidavit of Char Wittenberg ("Wittenberg Aff.")) at 3; Def. Ex. 10 ("Contreras Recommendation Mem."); Def. Ex. 11 ("Bronick Recommendation Mem."). Talley learned on January 28, 2011 that he was not selected for the 384724 Unit Chief announcement. *See* EEO Supp. Report of Investigation at 2. This second vacancy apparently was limited to Unit Chief of the Enforcement, Firearms and Tactics ("EFT") Unit. Vacancy Announcement No. 384724 at 2 ("You will serve as a Unit Chief in the Office of AD Enforcement, Firearms and Tactics Unit."); *see* EEO Supp. Report of Investigation at 11; Supp. Talley Aff. at 3; Def. Ex. 15 (Aff. of Conrad Agagan ("Agagan Aff.")) at 3; Def. Ex. 16 (Aff. of John K. Crowther ("Crowther Aff.")) at 3; Def. Reply Ex. 3 ("Archembault Dep. Excerpts") at 3 [Dkt. # 29-3]. While the parties in their briefing largely ignore that the Unit Chief vacancies were specific to particular units within ICE ERO, the nature of the positions is clear from the record and critical to understanding the facts relevant to Talley's claims.

Defendant selected Rosalio Estrada, a Hispanic male, for the DQI Unit Chief position. EEO Report of Investigation at 8, 9; Contreras Aff. at 4. Patrick Contreras, then the Deputy Assistant Director for ERO's Information Resource Management Division, recommended Estrada for this role. Contreras Aff. at 2, 4. The DQI Unit "is responsible for data quality evaluation, reviewing and creating measures in the ERO case lifecycle, and improving [agency] efficiencies by ensuring the data is accurate, reliable and timely." *Id.* at 4. After reviewing Estrada's resume and speaking with his immediate supervisor, Contreras concluded that Estrada was the best candidate to lead the DQI Unit because of Estrada's experience with ERO systems and ERO information technology ("IT") solutions, as well as his participation in the ERO modernization working group, which exposed him not only to data issues but also to the ERO's IT systems lifecycle. *Id.* In addition, during Estrada's 11 years at ICE headquarters he led "many IT related programs," including the Mexican Information Sharing Project and Alien Removal Coordination systems. *Id.* at 5. And Contreras gave special weight to Estrada's knowledge and understanding of ICE's Integrated Decision System and "ENFORCE Modules," software applications used by ICE personnel to manage the booking, detention, and removal of aliens. *Id.*; *see generally* Pl. Ex. F ("Estrada Resume") [Dkt. # 25-6]. Contreras memorialized his assessment of Estrada's qualifications in a recommendation memorandum to senior management. *See* Contreras Recommendation Mem. Contreras's superiors ultimately selected Estrada for the DQI position based on Contreras's recommendation. EEO Report of Investigation at 9, 11; Wittenberg Aff. at 4. No interviews were conducted for the DQI position. EEO Report of Investigation at 9; Contreras Aff. at 5.

Defendant selected Isela Reynoso, a Hispanic female, to lead the IPC Unit. EEO Report of Investigation at 7, 8; Bronick Aff. at 4. Matthew Bronick, then the Deputy Assistant Director for Information, Policy, and Communications, recommended Reynoso for the position. Bronick Aff. at 2, 4. According to Bronick, "Reynoso was the best candidate based on the depth and breadth of her overall experiences in areas that gave her the knowledge and skills necessary to fulfill the role of [IPC] Unit Chief." *Id.* at 4. Bronick highlighted Reynoso's "experience composing documents to communicate various aspects of an agency's programs to external audiences," and he gave particular weight to Reynoso's "project management, communications, writing, and organizational skills." *Id.* at 5. Bronick "decide[d] not to select/recommend" Talley for the IPC Unit Chief position because, in his view, Reynoso's experience, knowledge, and skills made her the best candidate for the role. *Id.* Like Contreras, Bronick submitted a recommendation memorandum to his superiors explaining his reasoning. *See* Bronick Recommendation Mem. In the memorandum, Bronick explained that he had evaluated Reynoso's performance as acting chief of a different unit and found her an "effective leader" who "can prioritize and monitor numerous assignments to ensure that deadlines are met." *Id.* In the acting position, Reynoso was "involved in all information requests received in [ERO] from many officers, the public, Congress, etc." *Id.*; *see also* Def. Reply Ex. 2 ("Bronick Dep. Excerpts") at 5 [Dkt. # 29-2] (Bronick testifying that Reynoso oversaw "a lot of traffic, correspondence and government-related emails, and other sources of input, correspondence and things that needed to be processed and tasked and answered"); Pl. Ex. G ("Reynoso Resume") [Dkt. # 25-7]. Bronick's superiors ultimately selected Reynoso

for the IPC position based on Bronick's recommendation. EEO Report of Investigation at 7–8, 9. No interviews were conducted for the IPC position. EEO Report of Investigation at 8, 9; Bronick Aff. at 5.

Finally, defendant selected John Miskei, a Caucasian male, to be Chief of the EFT Unit. Pl.'s Stmt. of Facts at 13. John Crowther, the Deputy Assistant Director for the Fugitive Division, recommended Miskei. EEO Supp. Report of Investigation at 8; Supp. Talley Aff. at 5. Crowther declared in an affidavit that he recommended Miskei to lead the EFT because of Miskei's "strong background in training" and his "real world street experience which is needed in this position as it is a training position." Crowther Aff. at 4. In his recommendation memorandum, Crowther explained that after conducting interviews and giving "careful consideration and extensive examination [to] all the other eligible candidates"—including plaintiff—he found Miskei "to be the most qualified for" the EFT position because he was currently an officer within the unit and had relevant experience in "a wide range of" subject matter areas, including "guidance and technical interpretation of ERO firearms policy," "removals, training/course development, criminal and administrative investigations, and detention," and "firearms and tactics, badge and credentials, health and safety, and uniforms." Def. Ex. 22 ("Crowther Recommendation Mem."); *see also* Def. Reply Ex. 4 ("Crowther Dep. Excerpts") at 2 [Dkt. # 29-4]; Pl.'s Stmt. of Facts at 10, 13. Miskei had also "served as the ERO liaison to the Federal Law Enforcement Training Center and the National Firearms Tactical and Training Unit." Crowther Recommendation Mem. To Crowther, Miskei's "skill set, experience, and interview . . . distinguished him from the other applicants" and would "prove to be an

enormous asset to the" EFT. *Id.* Crowther's superiors selected Miskei for the EFT position based on Crowther's recommendation. Def. Ex. 14 (Aff. of Gregory Archambeault ("Archambeault Aff.")) at 5; Def. Ex. 18 (Supp. Aff. of Robert Helwig ("Supp. Helwig Aff.")) at 4.

The record shows that Talley engaged in EEO activity on several occasions. In August 2007 and again January 2009, prior to the non-selections at issue in this case, Talley acted as a witness for a co-worker in the co-worker's EEO claim. *See* EEO Report of Investigation at 6; Talley Aff. at 3; Pl.'s Stmt. of Facts at 2. Around the same time, plaintiff filed two of his own complaints alleging racial discrimination that he witnessed toward the same co-worker. *Id.*; Talley Aff. at 3. The record also indicates that on May 5, 2010, the day Talley learned of his non-selection for the 321130 job announcement, he filed an employment discrimination complaint with the EEO Office, apparently followed by a formal complaint on August 26, 2010. *See* EEO Report of Investigation at 1–3; EEO Supp. Report of Investigation at 7; Supp. Talley Aff. at 3. The EEO Office investigated Talley's claim from December 3, 2010 and February 15, 2011, and submitted a formal Report of Investigation on February 16, 2011. EEO Report of Investigation at 3. Nine days later, on February 25, 2011, Talley requested that the EEO Office conduct a supplemental investigation of his January 28, 2011 non-selection for the 384724 vacancy announcement. EEO Supp. Report of Investigation at 2. The EEO Office investigated that claim from March 10, 2011 to August 22, 2011, and submitted a Supplemental Report of Investigation on August 22, 2011. *Id.* at 1, 3.

On August 1, 2014, Talley brought this action against defendant alleging unlawful discrimination and retaliation under Title VII. *See* Compl. [Dkt. # 1]. The parties engaged in a lengthy discovery period that ended September 30, 2016. On August 28, 2017, after nearly a year of silence from the parties, I ordered plaintiff to show cause why this action should not be dismissed for failure to prosecute. *See* Minute Order (Aug. 28, 2017). Talley responded and opposed dismissal, informing me that the parties had been engaged in settlement discussions. *See* [Dkt. # 20]. Those discussions did not resolve the case, and I set a summary judgment briefing schedule. *See* Minute Order (Nov. 29, 2017). Defendant moved for summary judgment on April 2, 2018, *see* [Dkt. # 24], and Talley filed his opposition on May 1, 2018, *see* [Dkt. # 25]. Defendant filed its reply on June 19, 2018. *See* [Dkt. # 29].

## **LEGAL STANDARD**

A party is entitled to summary judgment when the pleadings, discovery and disclosure materials on file, and any affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "may affect the outcome of the litigation." *Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant bears the initial burden of identifying evidence that demonstrates that there is no genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A movant can satisfy that burden by "citing to particular parts of materials in

the record," or by "showing that the materials cited do not establish" the "presence of a genuine dispute." Fed. R. Civ. P. 56(c). If the moving party meets its initial burden, then the nonmoving party—here, plaintiff—must identify the "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted). If the nonmoving party fails to proffer evidence to support its assertions, then the moving party may prevail by citing that "failure of proof." *Id.* at 323.

When evaluating a summary judgment motion, a court must "examine the facts in the record and all reasonable inferences derived therefrom in a light most favorable to the nonmoving party." *Robinson v. Pezzat*, 818 F.3d 1, 8 (D.C. Cir. 2016) (internal quotation marks omitted). To establish a genuine dispute of material fact sufficient to defeat summary judgment, however, the nonmoving party must come forward with more than "a scintilla of evidence" or the "mere allegations or denials" of his pleadings. *Anderson*, 477 U.S. at 248, 252.

## ANALYSIS

In his complaint, Talley asserts that defendant violated Title VII of the Civil Rights Act by discriminating against him based on race and retaliating against him based on prior protected EEO activity when defendant passed over Talley for the three Unit Chief positions. I will address these claims in turn.

### I. Discrimination

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To make out a Title VII violation, a plaintiff must demonstrate that the employer's actions were "more likely than not based on the consideration of impermissible factors." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). A plaintiff may do so by presenting "direct evidence" or "by establishing a prima facie case under the burden-shifting framework established in *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792, 802 (1973)]." *Kalekiristos v. CTF Hotel Mgmt. Corp.*, 958 F.Supp. 641, 665 (D.D.C. 1997).

However, in cases where "an employer has asserted a legitimate, non-discriminatory reason for the [adverse employment] decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case." *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original). Instead, in such cases the plaintiff's burden is to "produce[] sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin[.]" *Id.*

In this case, Talley suffered adverse employment actions when he was thrice passed over for the DQI, IPC, and EFT Unit Chief positions. Defendant asserted a legitimate, non-discriminatory reason for these non-selections—namely, that in each case, the relevant decisionmakers recommended and hired a candidate who, in their judgment, was more qualified than Talley. *See* Def.'s Mot. for Summ. J. at 9–14. As such, I must determine whether Talley has produced enough evidence to reasonably support a finding that one or more of these non-selections was the product not of a genuine qualifications-based decision

but instead the result of status-based discrimination. *See Brady*, 520 F.3d at 494; *Thompson v. McDonald*, 169 F.Supp.3d 170, 180 (D.D.C. 2016) (court "must examine the totality of the evidence" to determine whether reasonable jury could infer non-discriminatory rationale was "not the actual reason" and defendant intentionally discriminated).

Talley approaches this burden from two angles. First, he attacks defendant's qualifications-based rationale for each of the hiring decisions, arguing that an inference of discrimination can be drawn from Talley's superior qualifications and from certain irregularities in the selection process. *See* Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") at 9–28 [Dkt. # 25]. Second, regarding the EFT Unit Chief position, Talley contends that he has submitted sufficient evidence to show that defendant's explanation for selecting another candidate was merely a pretext for racial discrimination. *See id.* at 20–22.

### a. Relative Candidate Qualifications

Where, as here, an employer claims to have made the hiring decisions at issue "based on the relative qualifications of the candidates, a plaintiff can directly challenge that qualifications-based explanation." *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008). However, the path to a genuine triable issue is narrow. Only if the "qualifications gap" between a plaintiff and the selected candidate is so large as "to be inherently indicative of discrimination" can a reasonable jury "legitimately infer that the employer consciously selected a less-qualified candidate—something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture." *Id.* (quoting *Jackson v. Gonzales*, 496 F.3d 703, 707 (D.C. Cir. 2007)). Thus,

to successfully challenge a qualifications-based rationale, the plaintiff must show that he or she "was '*significantly* better qualified for the job' than those ultimately chosen." *Id.* (quoting *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006) (emphasis added)).

Here, taking the record and all inferences in Talley's favor, I find that he has not created a genuine triable issue that he was significantly more qualified for any of the Unit Chief positions than the candidates ultimately selected. How so?

Talley presents virtually identical arguments regarding the DQI and IPC Unit Chief positions and his credentials relative to Estrada and Reynoso, respectively.[1] Talley contends first that his "level of educational accomplishment" was "substantially higher" than the selected candidates because he holds a college degree and has completed additional coursework relevant to the Unit Chief role. *See* Pl.'s Opp'n at 25, 27. He also argues that his supervisory and management experience far surpassed Estrada's and

---

[1] Talley also argues as a threshold matter that defendant has "fail[ed] to carry the burden of production of the most essential facts" regarding the candidates' relative qualifications because the affidavits submitted by the recommending officials are not competent evidence due to lack of personal knowledge. *See* Pl.'s Opp'n at 10–12, 16–17, 20. The record shows otherwise. *See, e.g.*, Contreras Aff. at 3–5; Def. Reply Ex. 1 ("Contreras Dep. Excerpts") at 2 [Dkt. # 29-1]; Bronick Aff. at 3–5; Bronick Dep. Excerpts at 3–4; Crowther Aff. at 4–5. Talley also contends that I am precluded from comparing the candidates' qualifications because defendant did not provide Estrada's and Reynoso's professional resumes. *See* Pl.'s Opp'n 10–12, 16–17. Plaintiff cites no authority requiring that relative qualifications assessments be made based on formal resumes, as opposed to sworn affidavits from the hiring officials describing the candidates' qualifications. In any case, defendant attached Talley's resume to its summary judgment motion, *see* Def. Ex. 21 ("Talley Resume"), and Talley attached Estrada's and Reynoso's resumes, which were included in the EEO Report of Investigation, *see* Pl.'s Opp'n 24, to his opposition, *see* Pl. Exs. 6, 7—a wise decision given that *Brady* places the burden of production on him. As such, there is ample record evidence for me to compare the candidates' qualifications.

Reynoso's because he managed "large numbers of people" during his military service, and his skills and background made him better equipped than the selected candidates to fulfill the "Supervisory and/or Managerial Responsibilities" of Unit Chief. *Id.* at 25–28. Talley claims that his educational and supervisory and managerial background demonstrate that he was "significantly more qualified" than Estrada and that there is "practically no comparison" between him and Reynoso. *Id.* at 26–27.

Talley is correct that Estrada did not obtain a college degree, although he did complete 78 semester hours of coursework in mechanical engineering and business management. *See* Estrada Resume at 14; *see also* Def. Ex. 6 (Aff. of Robert Helwig ("Helwig Aff.")) at 4 (Estrada "studied at the University of Phoenix and University of Texas at El Paso"). However, Talley's claim that Reynoso's "resume does not indicate she finished any college degree, and whatever college work she did is not identified," Pl.'s Opp'n 27, mischaracterizes the record. In the "Education" section, Reynoso's resume lists both East Los Angeles College and the University of Southern California, indicating that she completed at least some college coursework at these institutions, if not obtained a degree. Reynoso Resume at 4; *see also* EEO Report of Investigation at 9; Helwig Aff. at 4 (Reynoso "studied at East Los Angeles College and the University of Southern California"). In either case, even if Reynoso's level of formal education could be fairly characterized as "disputed," it is not a material issue for trial. Defendant was under no obligation to hire Talley as Unit Chief even if his formal education was marginally better than the selected candidates. *See, e.g., Kargbo v. National Railroad Passenger Corp.*, 243 F.Supp.3d 6, 17–18 (D.D.C. 2017) (rejecting relative qualifications argument "even though

13

the plaintiff has greater formal education than the chosen candidates" because defendant "was permitted to prioritize" other qualifications "over formal education").

Moreover, even accepting the relative superiority of Talley's educational and managerial credentials, that is not enough for me to "second-guess how [defendant] weigh[ed] particular factors in the hiring decision." *Jackson*, 496 F.3d at 709. Plaintiff's qualifications were not "so far beyond [Estrada's or Reynoso's] as to permit an inference of discrimination under this Circuit's precedents." *Stoe v. Sessions*, 324 F.Supp.3d 176, 188 (D.D.C. 2018). Our Circuit Court's *en banc* decision in *Aka v. Washington Hospital Center*, 156 F.3d 1284 (D.C. Cir. 1998) is instructive on this point. In *Aka*, our Circuit held that a reasonable jury could infer discrimination where the plaintiff, who was not selected for a pharmacy technician position, had nineteen years of experience as a hospital assistant as well as bachelor's and master's degrees, while the other applicant did "not have a college degree," had worked in "the hospital laundry for slightly over a year," and had spent only two months as a pharmacy volunteer. 156 F.3d at 1286, 1295–96; *see also Stoe*, 324 F.Supp.3d at 188 (collecting cases where qualifications gap was sufficiently great to allow reasonable inference of discrimination). Here, the record does not reveal any disparity in qualifications comparable to those cases in which courts have permitted an inference of discrimination. As such, I must assume that defendant "is more capable of assessing the significance of small differences in the qualifications of the candidates, or that [defendant] simply made a judgment call." *Aka*, 156 F.3d at 1294.

In this same vein, Talley's reliance on his general supervisory and managerial experience runs headfirst into the deference afforded employers to prioritize specific

factors over more general qualifications. Courts are typically reticent to second-guess an employer's preference for particular qualifications, so long as those qualifications are relevant to the position. *See, e.g.*, *Grosdidier v. Broadcasting Bd. of Governors, Chairman*, 709 F.3d 19, 25 (D.C. Cir. 2013) (although "evidence showed that [plaintiff] had more experience as an editor," "the evidence also showed that [the selected candidate] had more internet and television broadcasting experience than [plaintiff], which is relevant to the position"); *Kargbo*, 243 F.Supp.3d at 17–18 (employer may "prioritize leadership experience and interview performance over formal education").

Such deference is appropriate on this record. Talley was evaluated on his capacity to lead distinct ERO Units, each with their own unique combination of duties and responsibilities. The evidence demonstrates that the selected candidates possessed skills and experiences relevant to those duties and responsibilities that Talley did not possess. As the record shows, and as the name "Data Quality & Integrity" implies, the DQI Unit handles "data quality evaluation," the review and creation of data measures, and efforts to improve efficiencies "by ensuring the data is accurate, reliable and timely." Contreras Aff. at 4. Estrada had substantial experience with ERO IT solutions and the entire ERO IT systems lifecycle. *Id.* He had led "many IT related programs" and had demonstrated familiarity with specific data programs germane to the DQI Unit's operations, including the ENFORCE Modules. *Id.* at 5. Similarly, the record shows that the IPC Unit is responsible primarily for communications-related functions, including inquiry responses and interagency information sharing. *See* Bronick Aff. at 4–5; Bronick Recommendation Mem. Reynoso had specific "experience composing documents to communicate various

15

aspects of an agency's programs to external audiences," and she had handled "information requests received in [ERO] from many officers, the public, [and] Congress." *Id.*

Talley does not contend that his professional background is comparable to Estrada's in the fields of IT and data systems, nor does he claim to have communications experience equal to Reynoso's. And he certainly does not argue that his qualifications in those areas substantially exceed the selected candidates'. As such, defendant "reasonably could prefer someone with a balance of experiences other than [Talley's] for the" DQI and IPC Unit Chief positions, *Stoe*, 324 F.Supp.3d at 188, and a reasonable jury could not infer that Talley's non-selection in favor of Estrada or Reynoso reflects intentional discrimination. *See, e.g.*, *Jackson*, 496 F.3d at 709 (fact that employer "based its ultimate hiring decision on one or more specific factors encompassed within a broader and more general job description does not itself raise an inference of discrimination sufficient to overcome summary judgment"); *Aka*, 156 F.3d at 1297 n.15 (reasonable employers "will take additional credentials into account, if those credentials would prove useful in performing the job"); *Vasser v. Shulkin*, 280 F.Supp.3d 9, 19 (D.D.C. 2017) (although plaintiff had "more managerial experience," and "may even be considered more qualified than" the selected candidate, "in light of the case law in this Circuit, the differences in their relative credentials would not appear so substantial that they might alone raise an inference of discrimination").

Finally, Talley's argument regarding the EFT position is limited to the claim that defendant's "emphasis on the firearms and tactics aspects of Mr. Miskei's career stand in jarring dissonance with the position description – which does not mention firearms at all."

16

Pl.'s Opp'n 28. To say the least, this is a curious assertion. The vacancy announcement for the EFT Unit Chief position contains a section titled "Duties," which states that the applicant "will serve as a Unit Chief in the Office of AD Enforcement, Firearms and Tactics Unit." Vacancy Announcement No. 384724 at 2; *see also* Crowther Aff. at 3 ("The position was for the Chief of the firearms and training unit. The individual would supervise that unit."); Archambeault Dep. Excerpts at 3. Moreover, Talley declared in an affidavit that during his EFT interview he stated, "I don't have experience as a firearm instructor." Supp. Talley Aff. at 6. On this record, it was eminently reasonable for defendant to consider this disparity in relevant experience, and it is equally reasonable for me to defer to that qualifications-based judgment here. *See Mayorga v. Ayers*, 281 F.Supp.3d 182, 199 (D.D.C. 2017) (plaintiff not significantly better qualified where "interviewers testified that experience with Ethernet, fiber-optic cables, and Cisco equipment is highly relevant to the vacant position" and "plaintiff told them he had little experience with Ethernet or fiber-optic work and that he had no experience with Cisco"); *see also Aka*, 156 F.3d at 1294 n.10 ("employer may of course select a candidate who on paper is less qualified for other reasons, such as subjective reactions that emerge in the interview").

In sum, the evidence paints a picture of a generally qualified applicant losing out to comparably qualified candidates with specialized expertise in the subject matter areas relevant to the vacant positions. In this kind of case, juries will "assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call." *Aka*, 156 F.3d at 1294. Because I am not "a super-personnel department," I will refrain from "second-guess[ing]

how [defendant] weigh[ed] particular factors in the hiring decision[s]," *Jackson*, 496 F.3d at 707, 709, and "defer to the [defendant's] decision[s] of what nondiscriminatory qualities" it sought in filling the Unit Chief positions. *Stewart v. Ashcroft*, 352 F.3d 422, 429 (D.C. Cir. 2003).

### b. Alleged Procedural Irregularities

As a general matter, "[a]long with disparate qualifications of the applicants, procedural irregularities in the selection process also may demonstrate that the employer's justification for a hiring or promotion decision was pretextual." *Kilby–Robb v. Duncan*, 77 F.Supp.3d 164, 174 (D.D.C. 2015). Here, Talley argues that defendant "fail[ed] to abide by agency rules for hiring and promotion" as to each of the selections and that this constitutes "evidence supporting the conclusion that Defendant's denial of promotion to Mr. Talley was done for discriminatory reasons." Pl.'s Opp'n at 18; *see also id.* at 13–15, 24. He notes specifically that while the vacancy announcements required submission of a questionnaire and referenced a point score that would be assigned to the candidates, *see* Vacancy Announcement No. 384724 at 4, there is no evidence that any selected candidate submitted a questionnaire or that any applicants were assigned a rating. Pl.'s Opp'n at 24. According to plaintiff, these purported departures from internal processes invite the inference that defendant's qualifications-based rationale is merely a pretext.

Unfortunately for Talley, even assuming he has established the foregoing procedural irregularities, he has not shown how those failures suggest discrimination. Indeed, Talley appears to have been treated exactly as the selected candidates were treated—like them, there is no evidence that Talley submitted a questionnaire or received a rating for any of

the Unit Chief positions. Talley's evidence points "less to any effort to mask an alternative unlawful purpose and more to a sloppiness in organizing this aspect of the [selection] process." *Grosdidier*, 709 F.3d at 27. Because the alleged procedural irregularities affected all applicants equally, a jury could not reasonably infer from them that Talley was the victim of status-based discrimination. *See, e.g.*, *Adeyemi*, 525 F.3d at 1228–29 (no triable issue where defendant "passed over all [similarly situated] candidates"); *Thompson*, 169 F.Supp.3d at 188 (no triable issue "without evidence of procedural irregularities that affected the plaintiff but not other candidates"); *Harris v. Chao*, 480 F.Supp.2d 104, 111 (D.D.C. 2007) (no triable issue where "plaintiff present[ed] no evidence that the personnel office treated other applicants any differently than him").

### c. Purported Discriminatory Animus

Talley's final attempt to survive summary judgment on his discrimination claim is his theory that Crowther's recommendation of Miskei over him for the EFT Unit Chief position "was tainted with racial animus." Pl.'s Opp'n at 20. A plaintiff may create a triable issue "by presenting . . . discriminatory statements by the employer, or other attitudes suggesting the decision maker harbors discriminatory animus," thus raising an inference of discrimination. *Holcomb*, 433 F.3d at 899 (internal citations omitted). Here, plaintiff relies on Crowther's allegedly "argumentative" affidavit responses to race-related questions, including Crowther's editorializing about his own race—"American," as his "family immigrated from Europe over the past 2 centuries"—and the race of Talley, who he described as having "darker skin than me but a lot of people do." Pl.'s Opp'n at 21. Talley also cites apparent inconsistencies regarding whether Crowther in fact understood

19

the meaning of "prior EEO activity" in the affidavit questions and whether Crowther was the recommending official or, as Crowther declared in an affidavit, merely "sat on an interview panel." *Id.* at 22–23 & n. 6. And finally, Talley highlight's Crowther's failure to respond at all to a question about the skills and abilities required for the position. *Id.* at 23. Based on the foregoing, Talley urges that Crowther "is dissembling to cover up a discriminatory purpose" and, thus, his statements rebut defendant's non-discriminatory rationale for selecting Miskei. *Id.* at 22 (quoting *Reeves v. Sanderson Plumbing Prods. Inc.*, 520 U.S. 133, 147–48 (2000)). I disagree.

To begin, "isolated race-based remark[s] unrelated to the relevant employment decision [cannot], without more, permit a jury to infer discrimination." *Morris v. McCarthy*, 825 F.3d 658, 669 (D.C. Cir. 2016); *see also Iyoha v. Architect of Capitol*, 282 F.Supp.3d 308, 321 (D.D.C. 2017) ("the alleged discriminatory statements cannot include mere stray remarks that have no bearing on the adverse action being challenged" (internal quotation marks omitted)). As such, Crowther's affidavit statements can support Talley's discrimination claim only if there exists "a clear nexus between" the statements and the relevant adverse action; this requires, *inter alia*, that the comments were "temporally close in time to" Talley's non-selection. *Ajisefinni v. KPMG LLP*, 17 F.Supp.3d 28, 44 (D.D.C. 2014). Here, Talley was passed over for the EFT position on January 28, 2011, *see* EEO Supp. Report of Investigation at 2, but Crowther's affidavit is dated July 5, 2011, nearly *six months after* the non-selection, Crowther Aff. at 7. This "significant lapse in time," *Iyoha*, 282 F.Supp.3d at 324, in combination with the fact that Crowther's affidavit post-

dates Talley's non-selection, leads me to conclude that the statements lack a sufficient relationship to the relevant adverse action.

More fundamentally, Crowther's declarations, without more, do not demonstrate that he harbored racial animus. Talley's "purely conclusory" ascription of racial animus to Crowther's comments is "without evidentiary support" and ventures "far beyond reasonable inference and into the realm of unfettered speculation." *Holcomb*, 433 F.3d at 899, 900. For example, Talley does not explain how the purported inconsistencies in Crowther's statements about prior EEO activity and his own role in the selection process support an inference of intentional racial discrimination. Nor does Talley articulate how animus can be inferred from Crowther's non-answer regarding the position's requirements. To be sure, a reasonable person could interpret the tone of some of Crowther's race-related responses as "argumentative," but that alone does not demonstrate culpability for the charged discrimination. *See Allen v. Johnson*, 795 F.3d 34, 47 (D.C. Cir. 2015). Rather, a fair reading of Crowther's statements indicates some combination of annoyance with the investigation process, insensitivity in discussing the issue of race, and/or a degree of defensiveness at having been accused of discrimination; the responses do not, however, suggest that anything "fishy" took place in Talley's non-selection for the EFT position. *See Salazar v. Wash. Metro. Transit Auth.*, 401 F.3d 504, 509 (D.C. Cir. 2005). This conclusion is bolstered by the fact that Crowther declared in the same affidavit that he knew Talley and believed that Talley was "a good man and a hard worker" and "could be

a unit chief," but simply was not the best qualified applicant for the position. Crowther Aff. at 4–5; *see also* Crowther Recommendation Mem.).[2]

Under these circumstances, while Talley arguably has created "a weak issue of fact" as to Crowther's *post hoc* mental state, *Reeves*, 530 U.S. at 148, his "mere speculations are insufficient to create a genuine issue of fact," *Brown v. Brody*, 199 F.3d 446, 459 (D.C. Cir. 1999) (internal quotation marks omitted). Drawing all inferences in Talley's favor, I find that Crowther's comments are insufficient to permit a reasonable jury to infer that Talley was not selected for the EFT position because of intentional discrimination.

## II. Retaliation

Talley claims that defendant violated Title VII by retaliating against him "on the basis of his prior protected EEO (civil rights) activity." Compl. ¶ 16. In addition to outlawing status-based discrimination, Title VII precludes employers from retaliating against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e–3(a). A prima facie case of retaliation requires a plaintiff to show that "(1) he engaged in protected activity; (2) he was subjected to an adverse employment action; and

---

[2] Talley also references statements made by two witnesses that the ERO's promotion practices generally are "unfair" and that ERO leadership "is not consistently supportive of EEO," which he claims "bolster" his pretext argument. Pl.'s Opp'n at 24. Without more, these statements are of minimal probative value and do not alter my conclusion. *See generally Hairston v. Vance-Cooks*, 773 F.3d 266, 274 (D.C. Cir. 2014) (rejecting argument that "discrimination complaints filed in the past . . . establish institutional discrimination"); *Holcomb*, 433 F.3d at 899–900 (finding unpersuasive as a proxy for discriminatory animus "the mere filing of two informal discrimination complaints against [a selecting official], where nothing more is known about the nature, merit, or outcome of those complaints").

(3) there was a causal link between the protected activity and the adverse action."

*Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007).

As with the discrimination claims, however, when the "employer has proffered a legitimate, non-retaliatory reason for a challenged employment action," the burden shifts to the plaintiff to "produce[] sufficient evidence for a reasonable jury to find that the employer's asserted non-retaliatory reason was not the actual reason and that the employer intentionally retaliated against the employee in violation of Title VII." *McGrath v. Clinton*, 666 F.3d 1377, 1383 (D.C. Cir. 2012) (alterations omitted); *see Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (*Brady* "appl[ies] equally to retaliation claims"). As such, "the only question" to be resolved "is whether [Talley] has proffered enough evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a 'pretext' for retaliation." *Durant v. District of Columbia Gov't*, 875 F.3d 685, 699 (D.C. Cir. 2017) (quoting *Burdine*, 450 U.S. at 253).

As described above, defendant has asserted a legitimate, non-retaliatory explanation for Talley's non-selection, and I must "proceed[] to the ultimate issue of retaliation *vel non* instead of evaluation whether [Talley] made out a prima facie case." *Jones*, 557 F.3d at 678.[3] Talley contends that he has raised a genuine triable issue based on the "temporal proximity between [his] protected EEO activity" in August 2007, January 2009, and May 2010, "and the non-selection" for the EFT Unit Chief position in

---

[3] As the arguments and evidence are substantially the same for the discrimination and retaliation claims, I do not find that defendant has waived its retaliation defense. *See* Pl.'s Opp'n at 29–30.

January 2011; he also relies on much of the evidence proffered in relation to the EFT discrimination claim. *See* Pl.'s Opp'n 30–32. Although plaintiff's brief is not precise on this point, he does not appear to attribute his DQI and IPC non-selections to unlawful retaliation. *See id.* Regardless, I find that Talley has not created a genuine dispute as to retaliation for any of the three non-selections.

Drawing "an inference of retaliatory motive based upon the 'mere proximity' in time between" Talley's EEO activity and the non-selections is "untenable on the record here." *Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009). Talley was required to present "positive evidence beyond mere proximity" in order "to defeat the presumption that [defendant's] proffered explanation" is "genuine." *Woodruff*, 482 F.3d at 530; *see also Durant*, 875 F.3d at 700. He provides no such positive evidence beyond a renewed emphasis on the same allegations of pretext raised in support of his discrimination claim. Moreover, the record indicates that none of the recommending or other relevant officials were aware of the prior EEO activity underlying Talley's retaliation claim, an element required to show causation in this context. *See, e.g., Moses v. Howard Univ. Hosp.*, 474 F.Supp.2d 117, 124 (D.D.C. 2007) ("causal connection" requires showing, *inter alia*, that "employer knew that the plaintiff engaged in protected activity" (citing *Holcomb*, 433 F.3d at 903)); Bronick Aff. at 3; Contreras Aff. at 3; Crowther Aff. at 3; *see also* Helwig Aff. at 3; Wittenberg Aff. at 3; Archambeault Aff. at 3; Agagan Aff. at 3.

Thus, for the same reasons that Talley's evidence does not rebut defendant's non-discriminatory rationale, it does not give rise to an inference of retaliation. *See Walker v. Johnson*, 798 F.3d 1085, 1093 (D.C. Cir. 2015) (rejecting retaliation claim based on "the

same allegations" presented in support of plaintiff's discrimination claim, "plus the temporal proximity between" plaintiff's EEO activity and the alleged adverse action).

## CONCLUSION

Although I am mindful of the need to be "vigilant in smoking out unlawful motives," *Allen*, 795 F.3d at 41, I must also remain "reluctan[t] to become involved in the micromanagement of everyday employment decisions," *Forman v. Small*, 271 F.3d 285, 291 (D.C. Cir. 2001). Thus, for all of the foregoing reasons, defendant's motion for summary judgment is **GRANTED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued herewith.

RICHARD J. LEON
United States District Judge